702 F.2d 1362
 30 Cont.Cas.Fed. (CCH) 70,884
 UNITED STATES, Appellant/Cross-Appellee,
v.
JOHN C. GRIMBERG CO., INC. and W.M. Schlosser Co., Inc.,
Appellees/Cross-Appellants.
 Appeal Nos. 83-506, 83-511.
 United States Court of Appeals,
Federal Circuit.
 March 23, 1983.
 
 J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., argued for appellant/cross-appellee. With him on brief were David M. Cohen and Eileen P. Fennessy, Washington, D.C.
 Herman M. Braude, Washington, D.C., argued for appellees/cross-appellants. With him on brief was Gerson B. Kramer and Douglas L. Patin, Washington, D.C.
 Before the Court In Banc.
 MARKEY, Chief Judge.
 
 
 1
 Disappointed bidders Grimberg and Schlosser jointly filed a post-award complaint in the Claims Court seeking termination and award to them of certain contracts awarded to another. They concurrently filed motions for a Temporary Restraining Order and a Preliminary Injunction. The Claims Court denied the motions and transferred the complaint to the District Court for the District of Columbia, 1 Cl.Ct. 253. We affirm.[1]
 
 Background
 
 2
 P.W. Parker Inc. (Parker), was the apparent winner on two contract bids opened on July 8, 1982, and September 13, 1982, respectively. On its bids, Parker identified its wholly-owned subsidiary, R & P Contractors (R & P), as subcontractor on all mechanical work.
 
 
 3
 On July 12, 1982, Grimberg protested to the GSA contracting officer that the listing of R & P, over which Parker had complete control, violated paragraph 10 of the Special Conditions of the Invitation for Bid.[2] By letter of July 29, 1982, the contracting officer acknowledged the protest, stating: "The bids are being evaluated by the contracting officer, and you will be advised of his decision."
 
 
 4
 On September 16, 1982, Schlosser made the same protest to the contracting officer respecting the bid opened on September 13, 1982. By letter of September 20, 1982, the contracting officer acknowledged the protest, stating: "The bids are being evaluated and you will be advised of our decision before an award is made."
 
 
 5
 On September 29 and 30, GSA awarded Parker the contracts.[3]
 
 
 6
 Grimberg and Schlosser jointly filed on October 4, 1982, the present complaint for Temporary Restraining Order, Preliminary Injunction, Permanent Injunction, and Declaratory Judgment, and concurrently filed Motions for a Temporary Restraining Order and Preliminary Injunction. On October 5, 1982, the government moved to dismiss for lack of jurisdiction.
 
 
 7
 In an Order entered October 7, 1982, Judge Willi of the Claims Court denied Grimberg's and Schlosser's motions for lack of jurisdiction under 28 U.S.C. Sec. 1491(a)(3) (Supp V 1981), as amended by Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, Sec. 133(a), 96 Stat. 25, 40 (1982) (Act),[4] and transferred the case to the district court pursuant to Sec. 301(a) of the Act [to be codified at 28 U.S.C. Sec. 1631].[5]Issues
 
 
 8
 I) Whether the Claims Court lacks jurisdiction to grant equitable relief in a suit brought after a contract has been awarded.
 
 
 9
 II) Whether the Claims Court erred in transferring the case.
 
 OPINION
 I--Jurisdiction
 
 10
 The dispute respecting jurisdiction arises because the complaint was filed in the Claims Court after the award of the contracts, making this a "post-award" suit, and because Grimberg and Schlosser are seeking equitable and only equitable relief.
 
 A. The Statute
 
 11
 Analysis must begin with the language of the statute. Southeastern Community College v. Davis, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979). See also, Greyhound Corp. v. Mount Hood Stages, Inc., 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978); Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977); Blue Chips Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J. concurring). Title 28, Section 1491(a)(3), supra note 4, reads in pertinent part: "To afford complete relief on any contract claim brought before the contract is awarded, the court shall have ... jurisdiction to grant declaratory judgments and ... equitable ... relief .... In exercising ...."
 
 
 12
 As discussed below, subsection (a)(3) is composed of five parts. The first part ("To afford complete relief") sets the purpose of its enactment, i.e., to authorize a new remedial power. The second part ("on any contract claim") establishes and limits the types of cases within the court's jurisdiction in which the power may be exercised. The third part ("brought before the contract is awarded") establishes and limits the time frame in which the power may be exercised. The fourth part ("declaratory judgments and such equitable and extraordinary relief as it deems proper") describes the power itself. The fifth part ("give due regard to the interests of material defense and national security") cautions the court in the use of its new power.
 
 
 13
 (1) The Single Word "Claim"
 
 
 14
 Grimberg and Schlosser would have us read subsection (a)(3) as though it contained words not there ("brought to the contracting officer before the contract is awarded", or "brought to court before or after the contract is awarded"), and as though it authorized the court to exercise its new power at any time. Their sole basis for suggesting that the statute may be so read lies in the single word "claim" in subsection (a)(3), and a contention that it means a claim filed with the contracting officer. They maintain that the filing of a claim with the contracting officer before the contract is awarded is sufficient to confer jurisdiction in the Claims Court to grant equitable relief in response to a complaint based on that claim, no matter when that complaint is filed in that court. Grimberg and Schlosser's difficulty is that the statute simply does not say "The Claims Court may grant equitable relief on a contract claim at any time if the claim had been brought to the contracting officer before the contract was awarded", and we are not at liberty to rewrite the statute in those terms.
 
 
 15
 Grimberg and Schlosser have been aided, in erecting their argument on the single word "claim", by the propensity of the Congress, the courts, and others, for using that word to mean different things in different contexts. In connection with government agencies, the word has meant an assertion or demand submitted to the agency. In connection with courts, it has been used to mean an "action", or a cause of action, or an assertion in a pleading.
 
 
 16
 That the word "claim", standing alone, may be considered ambiguous because it has been used with different meanings in different statutes, is true but unavailing. Nor is it helpful to note that most if not all "claims" against the government existed, or became vested, or were made to or filed with a government agency, as "claims" before being brought to a court. It is hard to visualize a "claim" properly called such in court which did not accrue as a "claim" at some time earlier than its presentation in court. Indeed, the entire statute of limitations jurisprudence rests on that concept.
 
 
 17
 Nor does it aid decision to note Congress' frequent use of "claim" in referring to both pre-court and in-court situations, often interchangeably. Nor does it follow that interpretation of "claim" as an action in court means that it was not also a "claim" at an earlier time. "Claim" cannot be considered in a vacuum. We sit to interpret a statute, not a word.
 
 
 18
 (2) As Used In the Statute
 
 
 19
 In Erlenbaugh v. U.S., 409 U.S. 239, 244, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972), the Court referred to "the principle that individual sections of a single statute should be construed together ...." We look, therefore, to uses of "claim" in all of the portions of Sec. 1491(a). In doing so, we note Sec. 1491(a) is a statute dealing with a court and suits against the sovereign. Section 1491(a) grants subject matter jurisdiction (subsection (a)(1); last sentence of (a)(2)), authorizes certain remedial actions (forepart of (a)(2)), and permits the exercise of equitable power in certain cases at a certain time ((a)(3)).[6]
 
 
 20
 Subsection (a)(3) is thus part of a statute (Sec. 1491(a)) in which Congress has defined the jurisdiction of the Claims Court to hear and determine suits and has spelled out actions the court may take in particular cases within that jurisdiction. Comparison of the grant in subsection (a)(3) with the grant in the adjacent subsections of the same statute, Title 28, Section 1491(a), supra note 4, (general jurisdiction "to render judgment upon any claim against the United States" in subsection (a)(1), and "to render judgment upon any claim by or against ... a contractor" in subsection (a)(2)) (emphasis added) would indicate that Congress intended a limited grant of power to grant an equitable remedy in subsection (a)(3) ("on any contract claim brought before the contract is awarded").
 
 
 21
 "Claim" appears in subsections (a)(1) and in the last sentence of (a)(2), supra note 4, in the phrase ("jurisdiction to render judgment upon any claim") granting subject matter jurisdiction.[7] In those instances, "claim" necessarily means a claim filed with the Claims Court, for the court would necessarily lack both jurisdiction and ability to "render judgment" on a claim not filed in the court. Similarly, "contract claim" appears in (a)(3) immediately after "To afford complete relief on any ...." Thus the "contract claim" must be both within the court's jurisdiction established in subsection (a)(1) and brought to the court before the court may grant any relief.
 
 
 22
 Further, a plaintiff may not obtain equitable relief just because a court has the power to grant it, but must state a claim which is itself within the jurisdiction of the court. Appropriately, therefore, subsection (a)(3) specifies the nature of the "claim" upon which declaratory judgments and equitable relief may be granted, namely a "contract claim". Subsection (a)(3) thus provides a new remedy in respect of a particular type of claim (contract) over which the court was granted jurisdiction in (a)(1) and does not provide that remedy in respect of other types of claims set forth in subsection (a)(1).
 
 
 23
 Jurisdiction is granted in (a)(1) over a claim founded upon "any express or implied contract". Neither Grimberg nor Schlosser has, of course, an express contract with the United States. Though the present complaints do not spell out the "contract claim" relied upon, and do not refer to subsection (a)(1), a fair construction indicates reliance on an implied contract to have the involved bids fairly and honestly considered. Moreover, only an implied contract claim is available to those who, like Grimberg and Schlosser, are bidders, not contractors. The "contract" in the phrase "brought before the contract is awarded" in (a)(3) is an express contract awarded to another, if awarded at all. It is not the implied contract on which a claim may be brought for equitable relief under (a)(3) and which is never "awarded". Thus (a)(3) made an equitable remedy available when a claim over which the court has jurisdiction (implied contract under (a)(1)) is filed in the court before a contract has been awarded.[8]
 
 
 24
 Grimberg and Schlosser have introduced no evidence, and none may be discerned anywhere in the record, that Congress intended suddenly to switch from the meaning of "claim" in subsections (a)(1) and (a)(2), where it meant a claim within the jurisdiction of the court to render judgment when the claim was brought to the court, to a different meaning (i.e., a claim filed with a contracting officer) in subsection (a)(3). On the contrary, because (a)(3) was being added to (a)(1), which set forth the Claims Court's jurisdiction to grant judgments on claims founded upon express or implied contracts, and to (a)(2), in which two of its three sentences set forth actions that court may take, it would appear logical that the legislative drafters would employ the same word and meaning, never dreaming or discussing the notion that resourceful counsel bent on achieving a particular result might interpret the single word "claim" in (a)(3) as referring to a claim filed with a contracting officer.[9]
 
 
 25
 Similarly, the use of "claim" in (a)(3) itself, read in context, requires that the equitable powers of the Claims Court be limited to the pre-award stage. It will not do to speak of subsection (a)(3) as merely "granting jurisdiction" over a contract claim. That jurisdiction had already been granted in (a)(1). As above indicated, (a)(3) grants a power to act ("To afford complete relief on any contract claim"). Though a "contract claim" is certainly a "claim" while it sits on a contracting officer's desk, the "grant complete relief" language of the statute establishes that Congress was dealing with the in-court time frame. It was not dealing with an earlier time frame, i.e., when the claim was filed with the contracting officer. It was not, in other words, establishing an "exhaustion of administrative remedies" requirement appropriate to proceedings under the Administrative Procedure Act which are not within the jurisdiction of the Claims Court. Congress was granting equitable powers and limiting their exercise to a particular stage in the government procurement process, i.e., the pre-award stage.
 
 
 26
 As indicated, we deal here not with the word "claim" as found in the dictionary or in substantive statutes, but with "claim" as used in a statute defining the newly granted power of the Claims Court to grant declaratory judgments and equitable relief. That Congress there used "claim" (rather than "action" or "lawsuit") to mean a claim brought to the court is not surprising, for it has done so not only in subsections (a)(1) and (a)(2) but in other statutes defining the jurisdiction of the Claims Court, see 28 U.S.C. Secs. 1495-1497, 1499 (1976) (amended 1982) ("The United States Claims Court shall have jurisdiction to render judgment upon any claim ..."), and has used the terms interchangeably, see 28 U.S.C. Sec. 1346(a)(2) (1976) (amended 1982) ("The district courts shall have original jurisdiction ... of: (2) Any other civil action or claim ....")
 
 
 27
 Pointing to some uses of "claim" in the Contract Disputes Act (CDA), 41 U.S.C. Secs. 601-613 (Supp. V 1981), as amended by Sec. 156 of the Act, Grimberg and Schlosser suggest that subsection (a)(3) should be read in pari materia with the CDA. First, the CDA deals with contractors, not with disappointed bidders such as Grimberg and Schlosser. Second, section 8(d) of that Act includes the phrase "a litigant asserting a contract claim in the United States Claims Court", 41 U.S.C. Sec. 607(d) (amended 1982) (emphasis added). Following Grimberg and Schlosser's suggestion would, if 8(d) be looked to, defeat their purpose. Third, the "in pari materia" canon of statutory construction cannot be relied upon to give "claim" in subsection (a)(3) a meaning that might be found at some points in a separate statute, and to deny it the meaning found at other points in that statute. Fourth, a meaning found in a separate statute cannot override that found in adjacent subsections of the very statute in which it appears, i.e., subsections (a)(1) and (a)(2).[10] "[T]he plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover." Chandler v. Roudebush, 425 U.S. 840, 848, 96 S.Ct. 1949, 1953, 48 L.Ed.2d 416 (1976), quoting Lynch v. Alworth-Stephens Co., 267 U.S. 364, 370, 45 S.Ct. 274, 275, 69 L.Ed. 660 (1925).
 
 
 28
 The words of the statute grant equitable powers to the Claims Court and limit the exercise of those powers to claims "brought before the contract is awarded". Use of the present tense ("is awarded"), rather than the past tense ("was awarded"), would appear to preclude exercise of equity power where, as here, the contract was awarded before the claim was filed in the court. Because the statute was dealing with the powers of the court, and because those powers are not exercisable until a claim is brought to the court, there is not a word in the statute referring to the contracting officer, and no basis appears anywhere for reading into it a role for the contracting officer. Nor is there anywhere in this statute (as there is in the standard disputes clause and the Contract Disputes Act, neither of which are before us) a requirement that an implied contract claim be submitted to a contracting officer before it may be brought to the Claims Court. Similarly, the words of the statute make no grant of equitable powers to the Claims Court in relation to post-award cases.
 
 
 29
 Further considering the words of the statute, subsection (a)(3) closes with an abjuration that the court "give due regard to the interests of national defense and national security" in exercising its new equitable powers. That caution would appear particularly applicable to court-created delays in awarding contracts. In a post-award suit, the contract has been awarded, and the procurement process itself is not normally delayed while the court is considering the merits of a disappointed bidder's complaint.
 
 
 30
 In all events, and whatever may be said of the words appearing in the statute,[11] and of their equitable remedy context, the legislative history makes eminently plain that Congress intended to limit exercise of the Claims Court's equitable powers to contract claims brought to the court before the contract is awarded. In essence, Congress intended to limit exercise of equitable powers by the Claims Court to the pre-award stage (without regard to whether a claim had been filed with a contracting officer), and to avoid the exercise of those powers by that court in the post-award, administration stage. Because it is our duty to carry out the intent of the Congress, to the fullest extent to which it is discoverable, we devote extended discussion to the statute's legislative history.
 
 B. Legislative History
 
 31
 Interpretation of "claim" in subsection (a)(3) as meaning a claim filed in the Claims Court, which is but another way of saying that the Claims Court may exercise its new equitable powers only during the pre-award stage, finds extensive support in the legislative history of the Act. H.R.Rep. No. 312, 97th Cong., 1st Sess. 43 (1981) states: "The new section 1491(a) does give the new Claims Court the augmented power to grant declaratory judgments and give equitable relief in contract actions prior to award." (emphasis added). S.Rep. No. 275, 97th Cong., 1st Sess. 22 (1981), U.S.Code Cong. & Admin.News 1982, pp. 11, 32 states: "Moreover, section 133 gives the new Claims Court the power to grant declaratory judgments and give equitable relief in contract actions prior to award." (emphasis added). It would appear difficult to read "contract actions prior to award" as referring to anything other than pre-award lawsuits filed with the court described in the same sentences as having been granted equitable powers in such "actions".
 
 
 32
 The earliest versions of the Act, introduced in the 96th Congress, did not grant the newly-created Claims Court any equitable powers in any case. See S. 1477, 96th Cong., 1st Sess. (1979); H.R. 3806, 96th Cong., 2nd Sess. (1980). As stated in the House Report on H.R. 3806, with one minor exception, "Claims Court jurisdiction is identical to Court of Claims jurisdiction." H.Rep. No. 1300, 96th Cong., 2nd Sess. 36 (1980). See also Staff of Senate Comm. On the Judiciary, 96th Cong., 1st Sess., Report on Federal Courts Improvement Act of 1979 (To Accompany S. 1477) 25 (Comm. Print 1979). With a few exceptions not here relevant, the Court of Claims did not have equitable jurisdiction.
 
 
 33
 The provision conferring equitable power on the Claims Court first appeared in versions of the Act introduced in the first session of the 97th Congress. The provision, identically worded in the Senate and House bills, provided that:
 
 
 34
 To afford complete relief in controversies within its jurisdiction, the court may grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief ....
 
 
 35
 S. 21, 97th Cong., 1st Sess. Sec. 132(a)(2) (1981); H.R. 2405, 97th Cong., 1st Sess. Sec. 126(d) (1981). That provision was significantly broader than the later version eventually enacted, for it would have given the Claims Court jurisdiction to grant equitable relief in all cases, not just in contract cases and not just on a "contract claim brought before the contract is awarded."
 
 
 36
 There appears to have been no discussion of the broad grant of equitable power in the 1981 congressional hearings on the Act or in subsequent floor debates in the House and Senate, but in a letter to the House Judiciary Committee the Justice Department objected strenuously to the grant:
 
 
 37
 [T]he bill would vastly broaden the equitable power of the Article I Claims Court judges by authorizing them to enter declaratory judgments and grant injunctive relief. In our view, this vast expansion of power would drastically alter the nature of the Government's waiver of sovereign immunity and could lead to serious and untoward disruptions in the award and administration of government contracts. The Court of Claims is not simply another district court; it was conceived as a special tribunal to resolve monetary claims against the United States, and we have historically and consistently supported its retention of that role. As former Deputy Assistant Attorney General Irving Jaffe stated before this Committee's Subcommittee on Administrative Law and Governmental Relations in 1977:
 
 
 38
 The Court of Claims should remain, as it was intended to be, the special tribunal where monetary claims can be resolved, divorced from the pressures generated by extraordinary proceedings to restrain or compel aspects of contract administration. Congress has, wisely, created the Court of Claims for this specialized task and no grounds exist to change it into another District Court. (emphasis added).
 
 
 39
 Court of Appeals For the Federal Circuit--1981, Hearings on H.R. 2405 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary, 97th Cong., 1st Sess. 212 (1981) (Letter from Acting Assistant Attorney General Michael W. Dolan to Committee Chairman Peter W. Rodino). As indicated, the chief concern of the Justice Department was that the broad grant of equitable powers would permit Claims Court judges to interfere with both the award and administration of government contracts. For this court now to hold that Claims Court judges have equitable power in post-award cases would defeat the response of Congress to the Justice Department's concern over that judicial interference with contract administration.[12]
 
 
 40
 Congress recognized the Justice Department's concern by limiting the area within which the Claims Court could exercise equitable powers. In the House, the Judiciary Committee amended H.R. 4482 to grant the Claims Court equitable power only "on any contract claim brought before the contract is awarded." The House Report on the bill sets forth the rationale for this amendment:
 
 
 41
 One amendment was unanimously approved by the full committee. Offered by Mr. Railsback, on behalf of the Administration, the amendment limited the ability of the new Claims Court to order injunctive and declaratory relief to contract actions prior to award. (emphasis added).
 
 
 42
 H.Rep. No. 312, 97th Cong., 1st Sess. 30, n. 33 (1981).
 
 
 43
 That passage sheds significant light. First, it expressly indicates that equitable relief on a contract claim was limited to "contract actions," that is, lawsuits, brought "prior to award". That view is further supported at another section of the House Report, which states that "[t]he new Claims Court also will be able to exercise equitable relief power--declaratory judgments and such extraordinary relief as it deems proper, including injunctive relief--in contract actions prior to award....." H.R.Rep. 312, supra, at 25. (emphasis added). See also H.R.Rep. 312, supra, at 43. ("Nor is it the intent of the Committee to obligate lawyers, litigants and possibly witnesses to travel to Washington, D.C., whenever equitable relief is sought in a contact [sic] action prior to award.") (emphasis added). Second, the passage expressly states that the amendment limited the ability of the Claims Court to exercise its equitable powers. It would thus be consistent with the intent of Congress to read "claim" narrowly, to mean the basis for a lawsuit brought prior to award; and it would be inconsistent with that intent of Congress to read the provision expansively, as being inclusive of all instances in which a claim had been submitted to a contracting officer before the contract was awarded.
 
 
 44
 That the Railsback amendment was offered "on behalf of the Administration" further buttresses the present interpretation. The amended grant of equitable powers incorporated the Justice Department's concerns over limiting judicial interference with the administration of government contracts. Though Congress did not fully agree with the Justice Department's position denying all equitable jurisdiction, it clearly responded to the Justice Department's concern that judicial interference in federal contracting be limited to actions brought in the Claims Court before the contract "is" awarded.[13]
 
 
 45
 There is a strong public interest in an orderly, efficient, expeditious government procurement process. With numerous contracts based on bids, there is one successful bidder and an untold number of disappointed bidders. Allowing a mere complaint to a contracting officer to trigger exercise of equitable power by the Claims Court over cases brought to it after the contract has been awarded would authorize broad judicial interference with the administration of government contracts; as here, contract actions could be brought after the contract had been awarded, and while it is being administered. That interpretation would thus substantially vitiate Congress' concern for the contracting process evidenced by introduction of the amendment "on behalf of the administration" and its adoption by the Congress. In contrast, the present interpretation permits judicial interference by the Claims Court only at the pre-award stage of the contracting process, and avoids such interference in the administration of awarded contracts.[14]
 
 
 46
 The grant of equitable jurisdiction in the Senate bill was also narrow.[15] As reported by the Senate Judiciary Committee, the Senate bill stated:
 
 
 47
 To afford complete relief in contract actions prior to award, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief ... (emphasis added).
 
 
 48
 S. 1700, 97th Cong., 1st Sess. Sec. 133(a)(3) (1981). Thus that bill, on its face, expressly limited the Claims Court's equitable jurisdiction to actions brought prior to award.
 
 
 49
 On the floor of the Senate, Senator Dole, the manager of the bill, explained the need for this provision in a statement repeated in expanded form in the Senate Report:
 
 
 50
 The fact that the Court of Claims lacks the authority to grant injunctive or declaratory relief to parties that seek its assistance has also been a major problem for litigants in Government contract cases, and has been decried by many practitioners as a glaring defect in its structure.
 
 
 51
 * * *
 
 
 52
 * * *
 
 
 53
 In addition, section 133 of the bill gives the new Claims Court the power to grant declaratory judgments and give equitable relief in controversies within its jurisdiction. This provision will for the first time give the court specializing in certain claims against the Federal Government the ability to grant litigants complete relief. The committee concluded that this provision will avoid the costly duplication in litigation presently required when a citizen seeks both damages and equitable relief against the Government.Moreover, section 133 gives the new Claims Court the power to grant declaratory judgments and give equitable relief in contract actions prior to award. Since the funds which the Government utilizes to purchase goods and services are derived solely from public sources, the public possesses a strong interest in the ability of the Government to fulfill its requirements in these areas at the lowest possible cost. Accordingly, in the vast majority of circumstances, the Government must be permitted to exercise its right to conduct business with those suppliers it selects and to do so in an expeditious manner.
 
 
 54
 The courts ordinarily refrain from interference with the procurement process by declining to enjoin the Government from awarding a contract to a contractor which the Government has selected.
 
 
 55
 By conferring jurisdiction upon the Claims Court to award injunctive relief in the preaward stage of the procurement process, the bill does not intend to alter the current state of the substantive law in this area. It is expected, and it is our intent, that the court will utilize the authority conferred upon it by this section only in circumstances where the contract, if awarded, would be the result of arbitrary or capricious action by the contracting officials which would deny qualified firms the opportunity to compete fairly for the procurement award ... (emphasis added).
 
 
 56
 127 Cong.Rec. S14692-S14694 (daily ed. Dec. 8, 1981). See also S.Rep. No. 275, supra, at 22-23. The quoted passage embodies the limiting principle of the Railsback Amendment, that is, that the Claims Court's equitable powers should be exercised in a way which best limits judicial interference in contract procurement and administration. It spoke of injunctions against awarding a contract. It also makes plain that injunctive relief was awardable only in the pre-award stage, and only in extremely limited circumstances.
 
 
 57
 Consistent with the foregoing is the statement in H.R.Rep. No. 312, supra, at 25, that "the Claims Court [is empowered] to enjoin the award of contracts if, for example, illegal government conduct is involved". (emphasis added). The court obviously could not "enjoin the award" of contracts already awarded. Nor would a declaratory judgment be appropriate after award. There is nothing anywhere in the legislative history referring to any power in the Claims Court to undo or vacate an awarded contract by way of mandatory injunction or otherwise.
 
 
 58
 The legislative history thus establishes the intent of Congress, which must be our lodestar, District of Columbia v. Carter, 409 U.S. 418, 420, 93 S.Ct. 602, 604, 34 L.Ed.2d 613 (1973), that equitable power was to be exercised only in contract actions brought in the Claims Court prior to award. Because the House bill was ultimately passed by both Houses of Congress and enacted as the Act, (see 128 Cong.Rec. S2567 (Mar. 22, 1982); 128 Cong.Rec. H747 (Mar. 9, 1982)) its legislative history must be given major weight. The legislative history of the Senate bill, however, establishes the same intent. There is no indication whatever that the Senate believed it was enlarging the time frame for exercise of the Claims Court's equitable relief powers by acceding to the House bill. In short, the legislative history indicates that the Senate and House Reports used the terms "action" and "claim" interchangeably, as both Houses have often done, both referring to contract actions/claims brought in the Claims Court prior to award.
 
 
 59
 Because the statute and its legislative history leave no doubt that Congress intended the equitable power of the Claims Court to be exercised only before an award is made, that power can be invoked only by filing a claim with the court before a contract is awarded, and whether a claim had previously been filed with a contracting officer is simply irrelevant.
 
 C. Policy Arguments
 
 60
 Grimberg and Schlosser make a number of sympathy evoking and dire predictions respecting what can happen if the Claims Court's exercise of its equitable powers be limited to cases brought prior to award. First they assert that a limitation on the exercise of equitable powers in the Claims Court to pre-award suits, while leaving untouched the equitable powers of the district courts, from which appeals may go to various appellate courts, risks non-uniformity in the law contrary to the intent of the Act. We deal here, however, only with Sec. 1491(a)(3) and its grant to the Claims Court of the power to grant an equitable remedy. That grant is applicable only to pre-award suits brought in that court. The statute is itself silent with respect to the powers of the district courts. Nothing in the statute indicates an intent to change the existing system under which appeals from district courts in post-award suits may be filed in various appellate courts. Further, as discussed below, the legislative history suggests a congressional intent to strike a jurisdictional balance, leaving untouched the powers of the district court in government contract cases.
 
 
 61
 The second and major policy argument is that limiting the Claims Court's equitable powers to pre-award suits enables the contracting officer to escape the equitable power of the Claims Court by awarding the contract before disappointed bidders can file their claims in that court, as happened here. The only recourse against that tactic is said to be the filing of premature and perhaps unnecessary protective suits.[16] Though recognizing, as we must, that the possibility exists, we are not prepared to join the conjecture that contracting officers are so lacking in dedication to the integrity of the procurement process that they would rush through awards to undeserving contractors just to keep disappointed bidders out of the Claims Court and force them into post-award suits in the district court. In all events, if there be potential for abuse of a statute, it cannot be controlling. The mere possibility that a contract may be awarded before an implied contract claim can be filed in court cannot be substituted for the constitutional requirement that courts shall exercise only those powers granted by Congress and shall do so only at the times specified by Congress; nor can such a possibility authorize us to expand by fiat that which has been authorized by Congress.[17]
 
 
 62
 In defining the jurisdiction and powers of the Claims Court, Congress made its own policy decision implementing a balance between the Claims Court and the district courts, and a balance between the interests of disappointed bidders and the public interest in an orderly government procurement process. We may not substitute for those policy decisions one of our own devising. Having accompanied the grant of limited equitable power to the Claims Court with the mandate that it be exercised "before a contract is awarded" and with "due regard to the interests of national defense and national security", Sec. 1491(a)(3), supra note 4, Congress did not disregard the needs of the government procurement system. Nor may we. Making the injunctive power of the Claims Court available to those protesting bid irregularities before a contract is awarded has not the same effect on the procurement system as would the making of that power available in the Claims Court to those protesting an award after it has been made.[18]
 
 
 63
 In all events, we deal here only with a specific statutory grant of equitable power to the Claims Court. If disappointed bidders should in future be confronted with insufficient time in which to invoke the equitable power statutorily granted the Claims Court, their remedy will lie with the Congress, not with the courts.[19]
 
 D. Holding on Jurisdiction
 
 64
 We hold that exercise of the equitable power granted the Claims Court in 28 U.S.C. Sec. 1491(a)(3) (amended 1982) is limited to cases in which complaints are filed in the Claims Court before the involved contracts have been awarded, and that the Claims Court therefore lacked jurisdiction to hear and determine the present demand for equitable relief filed after the involved contracts were awarded.
 
 II. Transfer
 
 65
 Section 1631, supra note 5, provides for transfer to any court "in which the action or appeal could have been brought." As a post-award suit, the present action "could have been brought" in the district court. The Claims Court, therefore, did not err in issuing its transfer order.
 
 A. Legislative History
 
 66
 Though this is a post-award suit, the parties have engaged in extensive argument over whether the "exclusive" grant of equitable powers to the Claims Court in Sec. 1491(a)(3) in pre-award suits was meant to exclude the district courts from pre-award suits. Because nothing in the statute or its legislative history in any manner denies jurisdiction in the district court over post-award suits, and because this is a post-award suit, we need not and do not here decide whether the district courts are denied jurisdiction by Sec. 1491(a)(3) over pre-award suits.[20]
 
 
 67
 To the extent that the legislative history could be said to shed light on the jurisdiction of the district court over this post-award suit, it does so by indicating that even the "exclusive" grant in pre-award suits was apparently not meant to take from the district courts whatever jurisdiction they had in those suits. Surely an apparent intent to leave intact a concurrent district court jurisdiction in pre-award actions, the only actions being dealt with in the statute, cannot be viewed as indicating an intent to remove the existing and unmentioned jurisdiction of the district courts over post-award suits.
 
 
 68
 The Senate and House Reports are consistent in their indication that the grant in Sec. 1491(a)(3) is exclusive only of contract boards, and that District Courts retain whatever equitable jurisdiction they had in contract cases under Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir.1970). The House report is explicit:
 
 
 69
 This enlarged authority is exclusive of the Board of Contract Appeals and not to the exclusion of the district courts. It is not the intent of the Committee to change existing caselaw as to the ability of parties to proceed in the district court pursuant to the provision of the Administrative Procedures Act in instances of illegal agency action. [Scanwell, supra.]... Therefore, for the time being, the Committee is satisfied by clothing the Claims Court with enlarged equitable powers not to the exclusion of the district courts. The dual questions of whether these powers should even be broader and of whether they should be exclusive of the district courts will have to wait for a later date. (emphasis added).
 
 
 70
 H.R.Rep. No. 312, supra, at 43.
 
 
 71
 The only question raised arises from the Senate Report. Unlike the House Report, it does not expressly state that the Claims Court's grant has no effect on the jurisdiction of the District Courts, and is only "exclusive" of the boards of contract appeals. However, that understanding can be derived from the Report. First, it states that the grant to the Claims Court is not "intend[ed] to alter the current state of the substantive law in this area. Specifically, the Scanwell doctrine as enunciated by the D.C. Circuit ... is left in tact (sic)." S.Rep. No. 275, supra, at 23, U.S.Code Cong. & Admin.News 1982, p. 33. The government suggests that this statement should be read to mean that only the substantive law aspects of Scanwell survive the grant, and that the grant of exclusive equitable power to the Claims Court robs the District Courts of any and all jurisdiction recognized in Scanwell. However, that argument ignores the "substantive law" of Scanwell and the "Scanwell doctrine".[21] Scanwell involved judicial review of agency action under the arbitrary and capricious standard of the Administrative Procedure Act (APA) and the Claims Court does not review under the APA. The holding of the Court of Appeals for the District of Columbia was that disappointed bidders have standing to seek equitable relief in a challenge to illegality in the procurement process. Thus, when the Senate Report stated that the substantive law and doctrine of Scanwell are still intact, it could only have meant that that holding on the District Court's equitable jurisdiction, at the very least in post-award suits under the APA, is still valid.
 
 
 72
 Moreover, the Senate strongly suggested that "exclusive" means exclusive of contract boards when it stated that "[s]ince the court is granted jurisdiction in this area, boards of contract appeals would not possess comparable authority pursuant to the last sentence of section 8(d) of the Contract Disputes Act." S.Rep. No. 275, supra, at 23, U.S.Code Cong. & Admin.News 1982, p. 33. This passage explains the need--recognized by Congress--to make the Claims Court's equitable powers exclusive of the boards. Under Section 8(d) of the CDA, agency boards are "authorized to grant any relief that would be available to a litigant asserting a contract claim in the United States Claims Court." Thus, if Congress had not made the Claims Court's equitable powers "exclusive" of contract boards, there would be a strong argument under Section 8(d) of the CDA that the boards would also have equitable powers.
 
 
 73
 It is not for us to question the wisdom of Congress' allocation of equitable power between the Claims Court and the District Courts in government contract cases. Under Sec. 1491(a)(3), the Claims Court has been granted equitable power only over implied contract actions brought prior to award. Whether the District Courts may retain equitable power over contract actions brought both before and after award, and whether that circumstance may create a dichotomy with respect to pre-award suits, is grist not for our mill.
 
 
 74
 Leaving with District Courts concurrent jurisdiction over pre-award suits would, in any event, respond to a congressional concern over forcing litigants to "travel to Washington, D.C., whenever equitable relief is sought in a contact (sic) action prior to award. Although Claims Court judges will travel, they cannot be expected to do so at extremely short notice." H.R.Rep. No. 312, supra, at 43.
 
 
 75
 Moreover, the House Report suggests that Congress intended the grant of equitable powers to the Claims Court in (a)(3) as an interim, perhaps experimental, measure, which after a few years might be altered: "for the time being, the Committee is satisfied by clothing the Claims Court with enlarged equitable powers not to the exclusion of the district courts. The dual questions of whether these powers should even be broader and of whether they should be exclusive of the district courts will have to wait for a later date." H.R.Rep. No. 312, supra, at 43 (emphasis added).
 
 
 76
 Thus, whatever its wisdom, Congress' grant to the Claims Court of limited equitable relief authority in pre-award cases, whether or not concurrent with the district courts in pre-award cases, but with no affect on the pre-existing jurisdiction of the district courts in post-award cases, must be accepted and followed by this court until it is changed by the Congress.
 
 B. Government Contentions
 
 77
 Citing the provision in Sec. 1491(a)(3) for "exclusive" equitable jurisdiction in the Claims Court over pre-award cases, the government argues against the transfer, asserting that the district court is barred thereby from exercising jurisdiction in this case. As the government correctly noted in opposing the jurisdiction of the Claims Court, however, this is not a pre-award suit. Section 1491(a)(3) deals only with pre-award suits and only with the powers of the Claims Court. As above indicated, we need not and do not decide, in this post-award case, whether "exclusive" was meant to preclude pre-award suits in the district court. It is for the district courts to so decide when and if pre-award suits are presented to them.[22] Whichever way they may decide that question, the grant of equitable powers to the Claims Court in pre-award cases would remain unaffected. It is sufficient to support the transfer to note that Sec. 1491(a)(3) in itself provides no barrier to jurisdiction of the district court in this post-award case.
 
 
 78
 Arguing against the transfer order, the government asks us: to disregard those portions of the legislative history (quoted above) in which the intent is stated to preserve "the ability of the parties to proceed in the district court ... in instances of illegal action"; to treat Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir.1970) and its progeny as no longer viable because they were assertedly designed to fill a void perceived in light of Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940) and now allegedly filled by enactment of Sec. 1491(a)(3); to review the historical jurisdictional relationship of the Court of Claims and the district courts;[23] to hold that Sec. 1491(a)(3) bars a post-award suit in the district court because that section involves a consent to suit and, at least impliedly, forbids relief under the Administrative Procedures Act; to consider a policy argument arising from a perceived opportunity for disappointed bidders to file a pre-award suit in the Claims Court and a post-award suit in the district court on the same facts and for the same relief after losing in the Claims Court and in this court (if Sec. 1491(a)(3) is not read as precluding post-award suits in the district court); and to view this case as though it were somehow one for money damages against the United States (in view of a plethora of cases in which courts have disregarded an injunctive relief demand when the gravamen of the complaint was for money damages). In sum, the government argues for a holding that in enacting Sec. 1491(a)(3) Congress intended to limit judicial relief for disappointed bidders to pre-award suits in the Claims Court and to deny all judicial relief to disappointed bidders whose complaint is filed in any court after an award has been made.[24] We find no basis for our so holding.
 
 C. Holding on Transfer
 
 79
 The district court, as judge of its own jurisdiction, may decide on review of the complaint and government arguments, if any, presented to it, that it does not have jurisdiction in this post-award case, and that the case is not therefore one that "could have been brought" as set forth in Sec. 1631, supra, note 5. Nothing presented to us requires that we so hold, or that we vacate the transfer order on that ground.
 
 
 80
 AFFIRMED.
 
 
 81
 NICHOLS, Circuit Judge, concurring in the result.
 
 
 82
 I concur in the result. Chief Judge Markey's able opinion in my view makes a much stronger case for affirmance than is made in the necessarily hastily written opinion of the Claims Court, or in the government briefs. I no longer feel able to say, as I would have said before the reargument, that the case for reversal was the only one that was supportable. I believed all along that the statutory test was ambiguous, viewing section 1491(a)(3) by itself alone. I believed that the obvious repeated meaning of the word "claim" in the original Tucker Act of 1887, 24 Stat. 505, included a demand for money accrued but not yet pursued in a lawsuit. The statute now to be construed picks up much of its language, including its use of "claim," from that origin, and no change in meaning could have been intended. "Claim," therefore, to my mind, included bid protests. The legislative history originally cited by the parties did nothing to discredit this interpretation. I now believe, however, that considering all the legislative history, my original construction cannot be said to be so obvious that a contrary view is frivolous, or untenable by objective minds. This being so, the doctrine of strict construction of the consent to be sued requires me to consider which of the contending views would grant the consent to be sued the least extensively. The doctrine requires that if there is real ambiguity in a statutory consent, the ambiguity must be resolved against the broad construction. The Supreme Court has said repeatedly that a consent to be effective must be "unequivocally expressed." United States v. Mitchell, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980); United States v. King, 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969). While "equivocal" sometimes connotes an intentional ambiguity, as distinguished from one that is inadvertent or accidental, I do not think the Supreme Court intended this distinction nor do the dictionary definitions require it. For present purposes, therefore, statutory words which are "ambiguous" are not "unequivocal," and judicial ingenuity to resolve the ambiguity, dehors the statute, is inappropriately exercised. There can be no doubt, therefore, that the majority's result is the strict construction result.
 
 
 83
 Strict construction is fully applicable when subject matter consent is granted only as to one particular kind of relief, but not another. United States v. King, supra, United States v. Jones, 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889) (money damages but not declaratory judgment or injunction.) Assuming a consented suit for money damages, strict construction still determines whether add-ons such as interest and counsel fees are permissible. Nibali v. United States, 634 F.2d 494 (Ct.Cl.1980); United States v. Mescalero Apache Tribe, 518 F.2d 1309 (Ct.Cl.1975), cert. denied, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). It is at least theoretically conceivable, if it has not occurred, that a suit was unambiguously consented to, but there was ambiguity whether the suit was to be brought in tribunal A or B. In these circumstances, strict construction would require that neither A nor B would have jurisdiction, and the suit would fail for want of any tribunal having jurisdiction.
 
 
 84
 This is strict construction as I understand it. If a consent taken literally achieves insignificant results, not worthy of the attention of Congress, that is what strict construction requires, and reconstruction of the language to effectuate what is supposed to be the true intention of Congress is not permissible, though it might have been in a different context. Aparacor, Inc. v. United States, 571 F.2d 552 (Ct.Cl.1978). See Nichols, Judge, concurring at 558, and see exposition of this case in Nibali, supra.
 
 
 85
 As I stated in Mitchell v. United States, 664 F.2d 265, 277 (Ct.Cl.1981), the old Court of Claims--
 
 
 86
 * * * [H]as repeatedly failed to take the doctrine of strict construction of the consent to be sued with sufficient seriousness, and apparently nothing can shake its obstinate adhesion to error, to which it repeatedly returns like an alcoholic to the bottle. * * *
 
 
 87
 The cure was difficult because of attractive but misleading rhetoric like that of Mr. Lincoln that decorates the lobby of the National Courts Building. I hope, and from the result in the instant case, conclude, that the avoidance of reversible error will loom larger in our new court. The commission of it never gets anyone anywhere. There can be no question but that Congress is thoroughly aware of strict construction and enacts new consents such as Sec. 1491(a)(3) in the expectation that they will be construed according to strict construction. If Congress wants to repeal strict construction, it has only to say so. I can't help but think that some consents are enacted tongue in cheek, with the full expectation that their effect will be insignificant. Of this the enactment construed in Aparacor was a prime example.
 
 
 88
 The main trouble with the statute as construed by our majority is that it achieves an insignificant and absurd result. There was a big to-do in the legislative history about Congress wanting courts not to meddle unduly by injunction in the administration of government contracts, an understandable and worthy wish. Yet all they did, by strict construction analysis, was to send litigants wishing to procure such intermeddling to one court in one time frame, to another court in another. If Congress had done nothing, the possibility of harmful judicial meddling with contract administration would have been exactly the same, no more and no less. There was surely nothing to show that intermeddling by the Claims Court would be more harmful than intermeddling by a district judge, or that intermeddling by the former would be more harmful after award than intermeddling before award, or that intermeddling by a district judge, on the contrary, would be less harmful after award than before. The bidder who for some inscrutable reason wants to litigate his bid protest only in the Claims Court need only file his suit without waiting to know if he has anything to protest. He may end up having sued to enjoin an award to himself. He will know enough not to believe a mere promise by the contracting officer to notify him before award. If some needless suits are filed, this should benefit some deserving members of the bar. The bidder who for some inscrutable reason wants to litigate only in the district court, need only hold his hand, ignoring plain intimations by the contracting officer that the award will go to another.
 
 
 89
 This is the zany scheme that, by strict construction analysis, Congress enacted.
 
 
 90
 In addition, it appears probable that many litigants wishing to obtain complete and entire relief, both injunction and bid preparation costs, will have to sue in two separate tribunals in order to do so. This is a favorable situation for the defense, and the ability to lay out an obstacle course in this manner is one of the incidents of the right to grant or withhold the consent to be sued, which the judiciary are not at liberty to bypass.
 
 
 91
 As I stated, dissenting in Mitchell, supra, no one would welcome more than I a legislative declaration that consents to be sued are to be construed liberally to effectuate the congressional intention. It seems to me that the outcome of this use ought to provide a push in that direction, and that is the best thing that can be said about it.
 
 
 92
 KASHIWA, Circuit Judge, with whom BALDWIN, BENNETT, and JACK R. MILLER, Circuit Judges, join, dissenting.
 
 
 93
 I respectfully dissent. I join Judge Bennett's dissent. Since I believe we have jurisdiction in this case, I do not reach the transfer issue.[1]
 
 
 94
 The holding of the majority not only creates an illogical bid protest procedure but also encourages protective litigation by disappointed bidders. Neither result was intended by Congress. Rather, the purpose of the Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, 96 Stat. 25 (the "Act") is to improve "the administration of the law in the areas of patents, government contracts, merit system protection, trademarks and international trade"[2] and "to improve the quality of our Federal court system and to enhance citizen access to justice."[3]
 
 
 95
 The majority today, for the first time, draws a distinction between jurisdiction and power that I find most unusual. I have not only never seen this distinction before but I believe it to be incorrect based upon prior law. It is a distinction without a difference. The majority argues that Sec. 1491(a)(1) grants the Claims Court jurisdiction over implied contract lawsuits, while Sec. 1491(a)(3) gives the Claims Court the power to grant equitable relief. It baffles me how one can have jurisdiction over a case but not the power to resolve it. The Supreme Court has said:
 
 
 96
 [W]hen the court has jurisdiction, it has power to decide the case brought before it * * *.
 
 
 97
 Industrial Addition Association v. Commissioner, 323 U.S. 310, 313, 65 S.Ct. 289, 291, 89 L.Ed. 260 (1945). See also Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 167, 60 S.Ct. 153, 154, 84 L.Ed. 167 (1939).
 
 
 98
 In line with its jurisdiction/power dichotomy, the majority contends that Sec. 1491(a)(1) gives jurisdiction to the Claims Court of all implied contracts and that the procedures set out in Keco Industries, Inc. v. United States, 428 F.2d 1233, 192 Ct.Cl. 773 (Ct.Cl.1970), should apply to all such contracts. Thus, it argues Sec. 1491(a)(3) cannot and should not be interpreted to require that a claim be brought to a contracting officer prior to institution of a law suit since Keco did not require such a claim. See majority at n. 8 and accompanying text, supra. The fallacy with the majority's argument lies with its failure to appreciate prior government contract law. Prior to the Contract Disputes Act of 1978, Pub.L. 95-563, 92 Stat. 2383, 41 U.S.C. Secs. 601-613 (Supp. V 1981) (the "CDA"), all breach of contract suits, including Keco-type suits, were brought directly to court without first exhausting administrative remedies.[4] The CDA was promulgated to provide one, uniform system for a contractor to pursue his claims. It was the CDA that introduced the requirement that a "claim" be brought first to a contracting officer in breach of contract cases. Since Sec. 1491(a)(3) was enacted subsequent to the CDA, it must be interpreted in light of that Act and not prior case law, discussed infra.
 
 
 99
 * The majority, as well as the Claims Court, construes the phrase "any contract claim brought before the contract is awarded" [emphasis added] to mean a lawsuit filed in the Claims Court. I, however, construe the word as merely an assertion of a right, a claim or bid protest brought to the attention of the contracting officer. The word "claim" has been interpreted numerous ways depending upon how the legislative scheme was meant to operate. See, e.g., Grumman Aerospace Corp. v. United States, 579 F.2d 586 (Ct.Cl.1978); O'Brien Gear & Machine Co. v. United States, 591 F.2d 666 (Ct.Cl.1979); Hageny v. United States, 570 F.2d 924 (Ct.Cl.1978). The majority concedes that the word "claim" can be ambiguous in meaning when standing alone, yet holds that when read in light of Secs. 1491(a)(1) and (a)(2) and other unrelated statutes its intended meaning as an "action" or "lawsuit" becomes clear.[5] Despite the majority's contention, "claim" is often not synonymous with "action" or "lawsuit." See, e.g., 28 U.S.C. Secs. 1330(a), 1335(b), 1338(b), 1346(b), 1346(c), 1407(a), and 1498(a). Yet, the historic legal meaning of the word "claim" as used against the Government was "a demand for money or for some transfer of public property." United States v. McNinch, 356 U.S. 595, 599, 78 S.Ct. 950, 952, 2 L.Ed.2d 1001 (1958). At its most basic a claim is simply an assertion of a right. As Judge Nichols states in his concurring opinion at p. 1377, "the obvious repeated meaning of the word 'claim' in the original Tucker Act of 1887, 24 Stat. 505, included a demand for money accrued but not yet pursued in a lawsuit."[6]
 
 
 100
 Looking for guidance to Secs. 1491(a)(1) and (a)(2) therefore does not resolve the ambiguity of the word "claim" as the majority would like us to think. "Claim" can reasonably be understood to just as easily mean the assertion of a right against the Government rather than a lawsuit. The ambiguity remains.
 
 II
 
 101
 Since the phrase "any contract claim brought before the contract is awarded" and in particular the word "claim" are ambiguous, other considerations must be examined. "In expounding a statute, we must not be guided by a single sentence or members of a sentence, but look to the provisions of the whole law, and to its object and policy." NLRB v. Lion Oil Co., 352 U.S. 282, 288, 77 S.Ct. 330, 333, 1 L.Ed.2d 331 (1957). One consideration is the statute's legislative history.
 
 
 102
 The majority's seemingly lengthy exposition of legislative history falls into the trap that Chief Judge Jones so wisely cautioned against, that "[a]n explanatory tale should not wag a statutory dog." A.P. Green Export Co. v. United States, 284 F.2d 383, 386, 151 Ct.Cl. 628 (Ct.Cl.1960). The majority's undue reliance in its examination of the legislative history is upon the use of one word, "action." That word is construed by the majority to have the same meaning as the word "claim" in the Act. Moreover, the majority at p. 1372, states:
 
 
 103
 In short, the legislative history indicates that the Senate and House Reports used the terms "action" and "claim" interchangeably, as both Houses have often done. In this instance, Congress intended that both refer to contract actions brought in the Claims Court prior to award.
 
 
 104
 I, however, fail to find any indication that Congress intended to equate "action" with "claim." If Congress had wished to do so, an explicit statement to this effect in the legislative history should have been present. Moreover, it is certainly strange that the statute itself speaks only of the word "claim," whereas the legislative history makes no mention whatsoever of the word "claim." It must be remembered that it is the statutory language itself that is the lodestar in statutory interpretation. United States v. Erika, Inc., 456 U.S. 201, 205, 102 S.Ct. 1650, 1653, 72 L.Ed.2d 12 (1982). Most importantly, if Congress had wished to place time limitations on filing suits for injunctive or declaratory relief, it certainly could have said so.
 
 
 105
 The majority claims that the adoption of Sec. 1491(a)(3) was at the instigation of the Justice Department and cites that letter accordingly. What the majority fails to tell us is that Sec. 1491(a)(3) was not the position advocated by the Justice Department, nor does it in any way resemble the Justice Department's position. What the Justice Department advocated was that the Claims Court be given absolutely no equitable powers in government contract cases. Hearings on H.R. 2405 Before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 97th Cong., 1st Sess. 212-13 (1981).[7] Since Congress did not adopt the Administration's position, these excerpts from the letter are no more elucidating than other statements made at the House hearings. The Justice Department letter was but one of at least 39 letters received by that subcommittee on the pending legislation; there is simply no basis to accord it the weight given by the majority. Nowhere in the legislative history is there any rationale given nor any proposal made that the injunctive powers given to the Claims Court should be dependent upon the time at which a suit is filed. I certainly cannot think of one. The majority's rationale of less judicial interference in government contracting administration is a false one.[8] A government contractor is able to circumvent this concern simply by filing a suit post-award in the district court.
 
 
 106
 Certain critical statements of the legislative history, although quoted by the majority, are simply ignored in its analysis. Senator Dole in pertinent part said:
 
 
 107
 The fact that the Court of Claims lacks the authority to grant injunctive or declaratory relief to parties that seek its assistance has also been a major problem for litigants in Government contract cases, and has been decried by many practitioners as a glaring defect in its structure.
 
 
 108
 * * *
 
 
 109
 * * *
 
 
 110
 In addition, section 133 of the bill gives the new Claims Court the power to grant declaratory judgments and give equitable relief in controversies within its jurisdiction. This provision will for the first time give the court specializing in certain claims against the Federal Government the ability to grant litigants complete relief. The committee concluded that this provision will avoid the costly duplication in litigation presently required when a citizen seeks both damages and equitable relief against the Government.
 
 
 111
 127 Cong.Rec. S14,692-94 (daily ed. Dec. 8, 1981). This last statement regarding section 133 of the bill was also made in the Senate Committee Report. S.Rep. No. 97-275, 97th Cong., 1st Sess. 22, reprinted in 1982 U.S.Code Cong. & Ad.News 32.
 
 
 112
 It is clear these statements are in reference to Sec. 1491(a)(3), the only new grant of equitable powers to the Claims Court. The Court of Claims had jurisdiction of bid protest cases for purposes of granting monetary relief for many years. Keco Industries, Inc. v. United States, 428 F.2d 1233, 192 Ct.Cl. 773 (Ct.Cl.1970). Such cases were only brought post-award. Since Keco-type cases are within the Claims Court's jurisdiction, it would seem that the Senate Report and Senator Dole say that the court will now be empowered to grant not only monetary but equitable relief in these cases. The portions of the Senate Report and Senator Dole's statements that the majority relies upon would then refer to the pre-award situation, a situation not met in the Keco line of cases. Thus, under this view Sec. 1491(a)(3) would cover both pre and post-award bid protests. On the other hand, these references to broad equitable powers are similar to those in the earlier unadopted version of the bill. See majority opinion at p. 1369. If these statements do refer to the earlier version of the bill, great doubt is thus cast upon the weight to be given the legislative history of the Act. In conclusion, the legislative history does not clarify the meaning of Sec. 1491(a)(3) but instead raises more questions.
 
 III
 
 113
 As demonstrated, the majority's approach has failed to resolve the question as to the meaning of the words "contract claim." When the meaning of words in a statute is ambiguous, it is necessary to interpret that meaning in light of the statute's purpose and intent. As the Supreme Court said in District of Columbia v. Carter, 409 U.S. 418, 420, 93 S.Ct. 602, 604, 34 L.Ed.2d 613 (1973):
 
 
 114
 [W]ords generally have different shades of meaning, and are to be construed if reasonably possible to effectuate the intent of the lawmakers; and this meaning in particular instances is to be arrived at, not only by a consideration of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed. [Citations omitted].
 
 
 115
 As previously stated, the purpose of the Act is to improve the administration of government contract law, to improve the quality of our court system and to enhance citizen access to justice. See text at n. 2 and n. 3, supra. This purpose can be effectuated and any ambiguity in the meaning of the word "claim" eliminated when Sec. 1491(a)(3) is read in pari materia with the Contract Disputes Act of 1978. The Court in Erlenbaugh v. United States, 409 U.S. 239, 243-44, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972), stated:
 
 
 116
 The rule of in pari materia--like any canon of statutory construction--is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context. Thus, for example, a "later act can ... be regarded as a legislative interpretation of [an] earlier act ... in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting," and "is therefore entitled to great weight in resolving any ambiguities and doubts." United States v. Stewart, supra, [311 U.S. 60] at 64-65 [61 S.Ct. 102 at 105, 85 L.Ed. 40]. See also, e.g., Hunter v. Erickson, 393 U.S. 385 [89 S.Ct. 557, 21 L.Ed.2d 616] (1969); United States v. Freeman, supra, [44 U.S. 556] at 565 [11 L.Ed. 724]. The rule is but a logical extension of the principle that individual sections of a single statute should be construed together, [footnote omitted] for it necessarily assumes that whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject, cf. Allen v. Grand Central Aircraft Co., 347 U.S. 535, 541-552 [74 S.Ct. 745, 748, 98 L.Ed. 933] (1954). [Emphasis added].
 
 
 117
 Since there are explicit references to the CDA in both the Act (e.g., Sec. 1491(a)(2)) and its legislative history, it is clear the drafters of the Act had the CDA before them when they drafted the portions of Sec. 1491 regarding government contract litigation. Moreover, the use of the word "exclusive" in Sec. 1491(a)(3) indicates that Congress had the CDA before it when the Act was drafted. The Senate stated:
 
 
 118
 Since the court is granted jurisdiction in this area, boards of contract appeals would not possess comparable authority pursuant to the last sentence of section 8(d) of the Contract Disputes Act. [41 U.S.C. Sec. 607(d) ]
 
 
 119
 S.Rep. 97-275, 97th Cong., 1st Sess. 23, reprinted in 1982 U.S.Code Cong. & Ad.News 33. Similarly, the House stated:
 
 
 120
 This enlarged authority [declaratory and injunctive powers] is exclusive of the Board of Contract Appeals and not to the exclusion of the district courts. [Emphasis added].
 
 
 121
 H.R.Rep. No. 97-312, 97th Cong., 1st Sess. 43 (1981). As construed by the majority, the word "exclusive" means that boards of contract appeals are excluded from granting declaratory and injunctive relief. Since boards of contract appeals are not mentioned in the Act, we must assume, correctly, that Congress had the CDA before it when the "exclusive" language was drafted. Congress therefore must have also considered the CDA when the "contract claim" language was drafted, since these words are in the same subsection (Sec. 1491(a)(3)) separated by only a comma:
 
 
 122
 To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper * * *. [Emphasis added].
 
 
 123
 Since both the Act and the CDA deal with the same subject matter, government contract litigation, and use the word "claim," it is obvious the drafters of the Act intended to use the word "claim" as it is used in the CDA.
 
 
 124
 Under the CDA, "claims" are required to be submitted to contracting officers, not to boards or courts. 41 U.S.C. Sec. 605. Section 605 in pertinent part states:
 
 
 125
 All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer.
 
 
 126
 * * *
 
 
 127
 * * *
 
 
 128
 The contracting officer's decision on the claim shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an appeal or suit is timely commenced as authorized by this chapter. [Emphasis added].
 
 
 129
 Thus, reading the Act in pari materia with the CDA, it is clear the Act's reference to "any contract claim brought before the contract is awarded" is a reference to pre-award claims submitted to the contracting officer. Although the confusion over the jurisdictional grant of Sec. 1491(a)(3) is brought about by the use of the term "contract claim" instead of the more popular term "bid protest," the confusion is readily resolved by examining the meaning of "contract claim" in its proper context. Otherwise, the jurisdictional grant of equitable and declaratory powers under Sec. 1491(a)(3) becomes meaningless. In other words, the use of "any contract claim" is an all-inclusive disputes term which is intended to include "bid protest claim." This interpretation conforms to the CDA's use of the word "claim," meaning all types of disputes decided by a contracting officer. Since "all claims" under the CDA must be referred to the contracting officer, and since the Act refers to "any claim," it is logical that "any claim" under the Act includes bid protest claims submitted to the contracting officer prior to award.
 
 
 130
 Moreover, sections 606 through 608 of the CDA state that boards render decisions on "appeals" from the decisions of contracting officers. It is also clear from Sec. 609 of the CDA that the Claims Court renders decisions on "actions" or "suits" "filed" at the court.[9] The use of the word "brought" together with the word "claim" is another signal of Congressional intent. A "contract claim" cannot be "brought" in the Claims Court; rather, an "action" or "suit" on a "claim" may be "filed" before the Claims Court. A "filing" fee must be paid to institute suit in the Claims Court. It is commonly understood in the government contract litigation field that "claims" are "submitted" or "brought" before "contracting officers"; "appeals" are "filed" with boards; and "suits" or "actions" are filed with the Claims Court. The absence of the words "suit," "action," or "filing" in Sec. 1491(a)(3) indicates the legislative intent to give equitable jurisdiction to the Claims Court over bid protest claims brought to the attention of the contracting officer prior to award. It is presumed that Congress used the word "claim" in its usual and well-settled sense. United States v. Stewart, 311 U.S. 60, 61 S.Ct. 102, 85 L.Ed. 40 (1940).
 
 
 131
 While the boards and the Claims Court hear cases involving "claims," all claims under the CDA must first be submitted to the contracting officer prior to resolution of the disputes by a board or the Claims Court. Therefore, using the doctrine of in pari materia, the phrase "contract claim brought before the contract is awarded" in the Act does not refer to "actions" or "suits" "filed" before award, but rather, refers to bid protest claims submitted by a disappointed bidder to the contracting officer prior to the award of the contract. In conclusion, interpretation of the statutory language of the Act is unambiguous when read in pari materia with the CDA and leads to a logical result.
 
 IV
 
 132
 Senator Dole and Congress recognized and sought to resolve the problem of bifurcated relief faced by government contractors. See text at pp. 1371-1372, supra. Thus viewed in its proper context, the legislative history supports the view that Congress intended to augment the existing jurisdiction over money claims involving government contracts[10] by including declaratory and injunctive powers.[11]
 
 
 133
 The legislative history of Sec. 1491(a)(3) makes numerous references to Scanwell-type litigation and the Scanwell Doctrine. Thus, the phrase "any contract claim brought before the contract is awarded" is a descriptive term of that doctrine as it has evolved in the district courts. Under the Scanwell Doctrine, a disappointed bidder generally makes an initial notification or bid protest to the contracting officer before the subject contract is awarded. An injunctive action may then be filed before or after the contract has been awarded. Thus, the statutory phrase "any contract claim brought before the contract is awarded" is a formal description of bid protest claims. See majority at n. 11, supra. Since the Scanwell case involved post-award court intervention after bid protest claims were brought to the contracting officer prior to award,[12] my interpretation is in harmony with the legislative intent, as well as the language of the Act. The majority view conflicts with the Scanwell Doctrine as referred to in the legislative history.
 
 V
 
 134
 The Court, in United States v. American Trucking Associations, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940), stated:
 
 
 135
 There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words.
 
 
 136
 My interpretation permits review of bid protest claims by the Claims Court as long as the protest was brought to the contracting officer prior to the award of a contract. The majority's interpretation, on the other hand, leads to an absurd result, or, as Judge Nichols states in his concurrence, a "zany scheme." The majority's interpretation is illogical in that bid protest claims may be decided by the Claims Court before the contracting officer can render a decision on the claim. The Claims Court will thus be thrust into the position of replacing the contracting officer in deciding bid protests. Under the majority view, a bid protestor cannot prudently wait for a contracting officer's decision on the protest and/or cannot safely assume that there will be enough time once the contracting officer's decision on the protest is rendered. Thus, the majority view necessitates the filing of a protective injunctive action by a bid protestor prior to any decision on the protest by the contracting officer. Otherwise, as occurred in the instant appeal, an award can be made by the contracting officer prior to rendering a decision on the protest, or shortly after rendering the decision on the protest, thereby precluding injunctive action in the Claims Court. This result creates an absurd "race to the courthouse" by bidders in order to invoke the Claims Court's jurisdiction; even the bidder who subsequently wins the contract may file a suit to protect itself. This will create a flood of premature litigation. In addition, the majority's interpretation, requiring the filing of an "action" before award, effectively undermines the contracting officers' present role in making decisions on bid protests. Such a result is neither necessary nor mandated by a reasonable reading of the Act.
 
 VI
 
 137
 In summary, the word "claim" in Sec. 1491(a)(3) does not mean "lawsuit" or "action," but rather the assertion of a right before the contracting officer. My interpretation is consistent with the meaning of the word "claim" as it is used in the CDA and in government contract litigation. It is obvious the reasonable intent of the statute is to give the Claims Court jurisdiction over bid protests which have been brought to the attention of the contracting officer before award.
 
 
 138
 BENNETT, Circuit Judge, with whom BALDWIN, KASHIWA, and JACK R. MILLER, Circuit Judges, join, dissenting.
 
 
 139
 I respectfully dissent from the majority's holding that the United States Claims Court loses equitable jurisdiction under 28 U.S.C. Sec. 1491 (Supp. V 1981), amended by the Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, Sec. 133(a), 96 Stat. 25, 40, if a petition or motion is not filed before the award of the contract. Since I believe that the Claims Court had jurisdiction of the "claims" (actions or lawsuits) before it,[1] I do not reach the transfer issue. I join Judge Kashiwa's dissent. I will add a few observations of my own which, together with those reasons already enumerated by Judge Kashiwa, convince me that the majority's holding is in serious error. Specifically, two considerations strongly suggest that the Claims Court had equitable jurisdiction over this case: (1) the general purpose of section 1491 (the Tucker Act); and (2) the purposes of the legislation granting the Claims Court equitable jurisdiction over bid protests.
 
 
 140
 The majority's view is contrary to the general purpose of section 1491 (the Tucker Act). The Tucker Act is the primary statute that defines the subject matter jurisdiction of the Claims Court. Nowhere in the statute is there any indication that Congress intended to define the procedural prerequisites to instituting a lawsuit--e.g., that the claim be timely filed. Rather, one looks to other statutes to determine whether a claim is timely.[2] According to the majority, however, Congress has expanded the Tucker Act by not just enlarging the relief available in bid protest suits, but also by adding a procedural requirement that the "claim" be filed in the Claims Court before the award of the contract. In the context of the Tucker Act, it seems puzzling why Congress would for the first time add a time limitation to this statute which was otherwise concerned only with defining the subject matter of a court. On the other hand, if it is accepted that the language used by Congress in section 1491(a)(3)--"any contract claim brought before the contract is awarded"--is only meant to define the subject matter where equitable relief is available (namely, bid protests), then such matters as when the claim is filed in the Claims Court become irrelevant; i.e., the time of filing would not change the underlying cause of action. It does not seem likely that Congress would establish a time limit as an absolute bar to jurisdiction without precisely defining the limit as such.
 
 
 141
 The language used by Congress in section 1491(a)(3) is arguably susceptible of different interpretations, as the several opinions filed today attest. Assuming for discussion only that the term "claim" is ambiguous, then it might be helpful to discern what Congress was attempting to accomplish in enacting this legislation. With the intent of Congress in mind, it should be easier to provide an interpretation that furthers the purposes of the statute.
 
 
 142
 I perceive two distinct ends which Congress contemplated in enacting the legislation before us: (1) that the Claims Court have jurisdiction to grant equitable relief so as to promote the integrity of the bidding process; and (2) that judicial interference be kept to a minimum so as not to delay the performance of government contracts unduly.[3]
 
 
 143
 A limitation on the jurisdiction of the Claims Court on the basis of an arbitrary procedural error does little to promote the integrity of the bidding process. There is no implication in this case that the contractors here were less than diligent in bringing their claims to the contracting officer, or, for that matter, were dilatory in filing their claims in the Claims Court. The contractors' error (if the majority's interpretation is accepted) is that they foolishly waited for the contracting officer to issue his decision on the protests before filing in the Claims Court.[4] Furthermore, the majority's interpretation would, in many instances, give the contracting officer the power to prevent the contractor from seeking equitable relief in the Claims Court by awarding the contract before rendering a decision on the claim, as happened here. This creates a paradoxical situation in which the contracting officer, whose allegedly illegal action forms the basis for the bid protest, is granted the power to determine for the contractor the forum in which he must press his suit.
 
 
 144
 Regarding the second goal of Congress, the ultimate result of the majority's holding that the Claims Court lacks jurisdiction will be greater judicial interference in the contracting process. The arbitrary cut-off or loss of jurisdiction after award will, as noted by Judge Kashiwa, result in a race to the courthouse to file premature litigation to ensure that a bidder is not denied access to the Claims Court. Disputes brought first to the contracting officer result in an overall reduction in litigation. This is the purpose of the standard government contract disputes clause and of the Contract Disputes Act of 1978, both of which require that any claims first be submitted to the contracting officer for exhaustion of administrative remedies before suit.[5] The statutory scheme endorsed by the majority actually discourages the informal resolution of bid protest claims, at the administrative level, as the luckless bidder who awaits a decision by the contracting officer is proceeding at its own risk. The Claims Court may therefore have to decide a multitude of cases that might have been settled administratively. In sum, I fail to see any legitimate goal, contemplated by Congress, which is served here by the divestiture of jurisdiction after the award of the contract when a bid protest claim had been made to the contracting officer before award.
 
 
 145
 The majority places great emphasis on its contention that "claim" as used in 28 U.S.C. Sec. 1491(a)(3) should be accorded the same meaning as that word is used in subsections (a)(1) and (a)(2) and that the Claims Court would not have jurisdiction over any "claim" before a petition is filed with the court. However, I do not believe that the word "claim" is used in subsections (a)(1) and (a)(2) in the sense of a limit on jurisdiction. "Claims" are indeed filed in the Claims Court, but the common usage of the word would also apply to a demand against the government before the "claim" actually becomes a lawsuit.[6] Even if a "claim" were never filed in court it would be common usage to say that one has a "claim" against the government. The majority opinion concedes this when it states:
 
 
 146
 It is hard to visualize a "claim" properly called such in court which did not accrue as a "claim" at some time earlier than its presentation in court. Indeed, the entire statute of limitations jurisprudence rests on that concept. [Emphasis in text.]
 
 
 147
 Having said this, however, the court concludes in this case that the word "claim" has a special meaning, although this seems wholly gratuitous in the context of the statute here which does not embellish the term but uses it in its common, generic sense.
 
 
 148
 The majority's exhaustive treatise on its concept of the "legislative history" (i.e., Senate and House reports, testimony, letters, speeches, rejected amendments and withdrawn bills)[7] can be likened to a house of cards whose structural stability is dependent on the majority's following conclusion: "In short, the legislative history indicates that the Senate and House Reports used the terms 'action' and 'claim' interchangeably, as both Houses have often done, both referring to contract actions/claims brought in the Claims Court prior to award." This conclusion, however, is without any support whatsoever. There is no evidence cited which indicates that Congress meant to use "claim" and "action" interchangeably, other than the vague suggestion that this is a certain lack of semantic precision for which Congress is famous. The simple fact is that when Congress actually enacted the statute it chose to use the phrase "any contract claim," not "action," not "lawsuit," and not any other description which explicitly supports the majority's interpretation.
 
 
 149
 "Congress may be presumed not unskilled in the use of words and highly likely to have enacted what it intended. It is foolish to abandon this presumption where the legislative history is perceivably full of pitfalls that cannot readily be avoided." Hart v. United States, 585 F.2d 1025, 1035, 218 Ct.Cl. 212 (Ct.Cl.1978).
 
 
 150
 Accordingly, I would hold that under section 1491(a)(3) the Claims Court had equitable jurisdiction since bid protest claims were made and were pending and that this jurisdiction was not lost when an award was made later before suit was filed. By the same token, if the contractor does not submit a bid protest claim to the contracting officer or the Claims Court before an award is made, he cannot ask equitable relief of the Claims Court. The majority holds that if the contractor files an action for equitable relief directly in the Claims Court before an award is made, then that court has jurisdiction, and presumably a subsequent award should not affect its jurisdiction. The majority's narrow interpretation gives the Claims Court only fleeting equitable jurisdiction. In fact, this interpretation robs the statute of much serious meaning, a result Congress surely did not contemplate for we cannot ascribe to it the conscious intent to do a foolish or useless thing.
 
 
 151
 The court has labored hard, at great length, and for several months now, to come up with the decision announced today. It has been difficult in part because the court has had to search through a dense jungle of legislative history to find a rationale it could use to rewrite the statute. As enacted 28 U.S.C. Sec. 1491(a)(3) reads:
 
 
 152
 To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant ... equitable ... relief.
 
 
 153
 As rewritten by the majority in this case the statute now reads:
 
 
 154
 To afford relief on a contract action (lawsuit) brought in court before the contract is awarded, the court shall have jurisdiction to grant equitable relief.
 
 
 155
 This sweeping judicial legislation, severely restricting the scope of section 1491(a)(3), is justified on the basis of an interpretation of legislative history. This suggests that Congress at the very least was ambiguous and did not know what it was saying when it wrote the statute, thus requiring the court's labored interpretation. As Judge Kashiwa demonstrates in his dissent, the legislative history can be read to support the plain English language used by Congress when it made a considered judgment to give the Claims Court broader jurisdiction than its predecessor, the Court of Claims, to provide equitable relief as well as money damages. But now we are told that "claim" means "action" which means lawsuit, and that "exclusive" means nonexclusive, and "any contract claim" means only those judicially processed. Possibly the majority's opinion must go on at such great length to achieve its ultimate result because of its opening misstatement of the first issue. It says that issue is:
 
 
 156
 Whether the Claims Court lacks jurisdiction to grant equitable relief in a suit brought after a contract has been awarded.
 
 
 157
 I would concede that the court has no such jurisdiction if that is the only fact. But, here it is not. A more accurate statement of the issue is:
 
 
 158
 Whether the Claims Court lacks jurisdiction to grant equitable relief when, before award or before suit is filed, a claim is made to the contracting officer as a bid protest and whether, therefore, Claims Court jurisdiction then vests, within the meaning of 28 U.S.C. Sec. 1491(a)(3), giving that court "exclusive" jurisdiction "[t]o afford complete relief on any contract claim brought before the contract is awarded ...."
 
 
 159
 A colleague in the majority, concurring separately in the majority's result, nevertheless describes that as an unhappy result, saying: "The main trouble with the statute as construed by our majority is that it achieves an insignificant and absurd result." He points out, and properly so, that a bidder will have to file a Claims Court suit "without waiting to know if he has anything to protest. He may end up having sued to enjoin an award to himself.... This is a zany scheme that, by strict construction analysis, Congress enacted." He continues: "[I]t appears probable that many litigants wishing to obtain complete and entire relief, both injunction and bid preparation costs, will have to sue in two separate tribunals in order to do so."
 
 
 160
 I accept this perceptive evaluation of the majority's product but, with greatest respect, I do not think that strict construction of this statute accounts for or necessitates an "insignificant and absurd result." Nor do I believe that the fault lies with Congress for such a result, rather than with the court. True strict construction would apply the statute simply as it reads, to encompass "any contract claim." United States v. American Trucking Associations, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). It is well-established in the law that in interpretation of statutes and regulations based on statutory authority "[a]bsurd and whimsical results of interpretation, unrelated to congressional purpose, are to be avoided." Kantor v. United States, 205 Ct.Cl. 1, 6-7 (1974); see also Steuer v. United States, 207 Ct.Cl. 282, 294 (1975); Anderson v. United States, 490 F.2d 921, 928 (Ct.Cl.), cert. denied, 419 U.S. 827, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974). "Thus, the unambiguous wording of a statute shall be given its plain and commonly understood meaning." Boege v. United States, 206 Ct.Cl. 560, 564 (1975); Prudential Insurance Company v. United States, 319 F.2d 161, 166 (Ct.Cl.1963). As Mr. Justice Frankfurter said, in speaking of the proper attitude with which we should approach the problem of statutory construction: "[O]ur problem is to construe what Congress has written. After all, Congress expresses its purpose by words. It is for us to ascertain--neither to add nor to subtract, neither to delete nor to distort." 62 Cases of Jam v. United States, 340 U.S. 593, 596, 71 S.Ct. 515, 518, 95 L.Ed. 566 (1951).
 
 
 161
 Application of these simple rules to interpret the statute here would avoid the tortuous result achieved by the majority through a protracted semantic exercise, reliance on questionable legislative history, and bald assertions of what the law is and what is relevant or irrelevant to the case. Application of the commonly accepted rules of statutory construction would assure a reasonable result not reflecting so unfavorably on the ability of Congress to express its will in legislation. Surely this would best serve the congressional purpose, the public contract community, the interests of justice, and certainly the United States Claims Court whose new equitable jurisdiction is much diminished by the majority's successful assault upon it.
 
 
 
 [1]
 This case was originally argued before a five-judge panel on November 1, 1982. On December 10, 1982 the court determined sua sponte that the issue was of such magnitude as to warrant consideration and determination by the court in banc. Argument before the court in banc occurred on February 7, 1983
 
 
 [2]
 Paragraph 10 of the Special Conditions of the Invitation For Bid No. GS-11B-18208 contains a "Listing of Subcontractors provision" designed to discourage post-award shopping for subcontractors by the successful prime contractor
 
 
 [3]
 Grimberg and Schlosser argue before us that a contract is not formed until acceptance is actually received by the successful bidder and that the Government introduced no evidence of that receipt. The argument is unavailing in view of the allegations of the complaint, in which existence of the Parker contracts is conceded
 
 
 [4]
 28 U.S.C. Sec. 1491(a), as amended, provides:
 (1) The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.
 (2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Claims Court shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978.
 (3) To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief. In exercising this jurisdiction, the court shall give due regard to the interests of national defense and national security.
 
 
 [5]
 28 U.S.C. Sec. 1631 provides:
 Whenever a civil action is filed in a court as defined in section 610 of this title or an appeal, including a petition for review of administrative action, is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.
 
 
 [6]
 Use of "jurisdiction" in subsection (a)(3) can be misleading. That subsection, like the first two sentences in subsection (a)(2), deals with the power of the court to grant a particular remedy, (a)(3) being applicable when the claim in suit is of a particular nature, i.e., "contract claim", as distinguished from other claims listed in subsection 1491(a)(1). Because the Claims Court certainly has subject matter jurisdiction, it is more accurate to speak of (a)(3) as granting equitable power than as granting "equitable jurisdiction." The result is the same, where as here, the court can be said to lack either "jurisdiction" or authority to exercise its equitable power, and a litigant is seeking only the exercise of that power
 
 
 [7]
 The last sentence of subsection (a)(2) deals with a "contractor" and is thus limited to suits involving an awarded contract
 
 
 [8]
 In Keco Industries, Inc. v. United States, 428 F.2d 1233, 192 Ct.Cl. 773 (Ct.Cl.1970), our predecessor the Court of Claims spelled out the standing of a disappointed bidder to sue on an implied contract to have his bid fairly and honestly considered, limited recovery to bid preparation costs, and denied a claim for lost profits, distinguishing the "contract", which the court pointed out was not and might not have been awarded to Keco, from the implied contract claim from which standing derived. Keco had not filed a claim with the contracting officer and the court imposed no requirement for such filing
 
 
 [9]
 If Congress intended a difference in its use of "claim" in subsection (a)(3), from its use in subsections (a)(1) and (a)(2), that fact would argue for a more restrictive interpretation, for in subsection (a)(3) Congress was granting a new equitable power enabling judges of the Claims Court to interfere in the government contracting process. It should not be surprising that it would limit that interference to the pre-award stage
 
 
 [10]
 To apply in pari materia to the CDA, as Grimberg and Schlosser would have us do, without first attempting to harmonize the uses of "claim" in the portions of section 1491(a), ignores the very premise on which the canon is based. In Erlenbaugh v. U.S., supra, the Court said the rule of in pari materia "is but a logical extension of the principle that the individual sections of a single statute should be construed together ...."
 
 
 [11]
 Use of the phrase "contract claim" in subsection (a)(3) appears incongruous in relation to a claim brought before an express contract exists. It is undisputed, however, that the phrase must necessarily be interpreted as referring to a claim relating to the prospective award of a contract, i.e., to an implied contract that a contract bid will be fairly and honestly considered, or, in short-hand, to a "bid protest"
 
 
 [12]
 Grimberg and Schlosser have moved this court for an order staying all further performance and the making of any further payments "under the contracts awarded" to Parker
 
 
 [13]
 Thus what Congress did speaks even more eloquently of its intent than what it said about what it was doing. Adoption of the view that Sec. 1491(a)(3) gives the Claims Court equitable powers in cases brought to the court after a contract was awarded would in large part reinstate in contract cases the broad grant rejected by the Congress
 
 
 [14]
 As discussed infra, the wisdom of that approach is not before us. In all events, the commendable dispatch with which the Claims Court acted in the present case (three days from filing to order) would indicate that the needs of the contract system are not likely to go unmet as a result of the limited grant of equitable power at the pre-award stage to that court in subsection (a)(3)
 
 
 [15]
 While the Senate and House bills were both passed during the 96th Congress, the agreed upon compromise bill was ultimately withdrawn from consideration in the Senate because of an attempt to "add a controversial nongermane amendment." S.Rep. No. 275, 97th Cong., 1st Sess. 2 (1981)
 
 
 [16]
 Nothing in the statute would, of course, impede administrative resolution of the implied contract claims of disappointed bidders, either before or after suit was brought in the Claims Court
 
 
 [17]
 Whether Congress "intended" a potential for contracting officers to escape the Claims Court, or the filing of protective suits, can never be known. (It may have viewed as safeguards against those possibilities the provisions of 41 C.F.R. 1-2.407-8(b)(4)). We cannot say that Congress would not have accepted those possibilities as evils of lesser importance than those it saw in enabling Claims Court judges to interfere in post-award contract administration. In any event, it is not for us as judges to say that Congress would not have written the statute the way it did, or explained the statute as it did in the legislative history, if it knew then of the possibilities for abuse we have now "discovered". What to some may have the face of folly may to others stand as statesmanship. We have a statute and must apply, not rewrite, it
 
 
 [18]
 Congress has not acted to deny equitable relief to those challenging in the district court an award made as a result of illegal agency action. Whatever may be said respecting the clarity of remarks in the legislative history of the Act concerning the role of the district courts, nothing anywhere in that history, or in the statute, even remotely states an intent to deprive those courts of their traditional equity powers or to transfer their pre-existing equity jurisdiction in post-award suits to the Claims Court
 
 
 [19]
 Schlosser contends the government should be estopped from relying on the award having been made before suit was filed, because the contracting officer said Schlosser would be advised before an award was made. As indicated in the text, whether a broken promise to notify means a contract was improperly or illegally awarded may be a matter for consideration by the district court in this post-award suit. The present attack on awarded contracts is outside the Claims Court's equitable power to act in circumstances that would render a contract, if it were awarded in the future, the result of caprice. "Moreover, the Committee expects that the court will utilize the authority conferred upon it by this section only in circumstances where the contract, if awarded, would be the result of arbitrary or capricious action by the contracting officials, to deny qualified firms the opportunity to compete fairly for the procurement award." S.Rep. No. 275, 97th Cong., 1st Sess. 23 (1981) (emphasis added), U.S.Code Cong. & Admin.News 1982, p. 33
 
 
 [20]
 Pre-award suits for injunctive relief in the district courts have faced a heavy burden. See Wheelabrator Corp. v. Chafee, 455 F.2d 1306 (D.C.Cir.1971); M. Steinthal & Co. v. Seamans, 455 F.2d 1289 (D.C.Cir.1971); A.G. Schoonmaker Co. v. Resor, 445 F.2d 726 (D.C.Cir.1971)
 
 
 [21]
 Scanwell was a post-award case, not a pre-award suit by a disappointed bidder asserting an implied contract claim. That the court required disappointed bidders to have made a protest to the contracting officer before the award was but an appropriate requirement for exhaustion of administrative remedies under the APA. The court there could have made no precedential holding respecting pre-award suits. The reference to Scanwell was occasioned by the presence of the word "exclusive" in Sec. 1491(a)(3) and the Congress was at pains to make clear that it was not ousting the district courts of the jurisdiction exercised in Scanwell. If the Congress intended that all bid protest cases, those brought to court before and after award, be subject to equitable powers of the Claims Court, it never said so. Further, if that were so, there would be no need to have referred at all to Scanwell (other than to remark its demise) and there certainly would have been no need to say "not to the exclusion of the district courts", supra
 
 
 [22]
 In Opal Manufacturing Co., Ltd. v. UMC Industries, Inc., 553 F.Supp. 131 (D.D.C.1982), Judge Richey, referring only to the statute, held that the Act excluded district courts from the exercise of jurisdiction in pre-award suits, and noted that district court jurisdiction is proper over post-award contract claims. In American District Telegraph v. Dep't of Energy, 555 F.Supp. 1244 (D.D.C.1983), Judge Flannery held that the district court has jurisdiction over post-award suits
 
 
 [23]
 The government conceded that a disappointed bidder may claim bid preparation costs in the Claims Court, citing Keco Industries, Inc. v. United States, supra, note 8, and in a district court if the claim be for less than $10,000, citing 28 U.S.C. Sec. 1346(a). Congress has not, in enacting Sec. 1491(a)(3), removed or diminished the subject matter jurisdiction of the Claims Court, nor has it imposed thereby a time limitation on the filing of bid protest (implied contract claim) actions to obtain bid preparation costs. What it did was limit the availability of equitable relief to such actions brought before the contract is awarded. Grimberg and Schlosser have not here sought bid preparation costs
 
 
 [24]
 That view would foreclose judicial review entirely with respect to negotiated or "award upon bid opening" contracts, a pre-award action being impossible in those instances
 
 
 [1]
 Although the majority has rejected the Government's argument that the Act precludes granting of injunctive relief by district courts in bid protest cases, I have a few observations regarding its argument. In Scanwell-type cases, post-award bid protests are common; and district courts are permitted to grant injunctive relief. See Opal Manufacturing Co. v. United States Postal Service, 553 F.Supp. 131 (D.D.C.1982). The Government, however, argues that in bid protest cases, one, injunctive relief is available only before award at the Claims Court, and two, injunctive relief after award is not available at all. This argument, if accepted, closes injunctive relief to bidders of negotiated and "award upon bid opening" type of contracts
 In recent years procurement by negotiation, as permitted by 10 U.S.C. Secs. 2301-2314 (Supp. V 1981), has become prevalent and substantial portions of defense procurement have been obtained in this fashion. The Government did acknowledge at oral argument that procurement by negotiation is the prevalent procurement method. For example, in Fiscal Year 1976, the dollar amount of public advertised (such as the instant appeal) and negotiated contracts awarded were:
 Civilian Agencies Defense Agencies
 Advertised $ 3,635,381,000 $ 3,232,425,000
 Negotiated $12,366,752,000 $37,493,765,000
 
 
 [1]
 R. Nash & J. Cibinic, Federal Procurement Law 317 (3d ed. 1977). See generally 1B J. McBride & T. Touhey, Government Contracts, ch. 9 (1981 and Supp.1982). Since the Government's negotiations with all bidders are secret, no bidder can possibly have knowledge or notice of irregularities to warrant filing a bid protest prior to award. If one is to follow the Government's reasoning, a negotiated-type bidder has no forum which can grant him injunctive relief
 
 
 [2]
 H.R.Rep. No. 97-312, 97th Cong., 1st Sess. 17 (1981)
 
 
 [3]
 S.Rep. No. 97-275, 97th Cong., 1st Sess. 1, reprinted in 1982 U.S.Code Cong. & Ad.News 11
 
 
 [4]
 The Senate Report of the CDA, S.Rep. No. 95-1118, 95th Cong., 2d Sess. 3, reprinted in 1978 U.S.Code Cong. & Ad.News 5237, said in pertinent part:
 III. Background and Need for Legislation
 * * *
 Direct Access to the courts is limited to so-called breach of contract claims, and the agencies can, and do, circumscribe such access by terms and conditions in contracts that are not, in general, subject to negotiation. In other words, a contractor has little choice in the matter.
 In large part, the present Government contract remedies system has developed in an unplanned manner. Many of the rules and requirements that govern the system are the result of unstructured reactions to various events and decisions.
 
 
 [5]
 It is interesting to note that on the one hand the majority says that the argument "[t]hat the word 'claim,' standing alone, is ambiguous because it has been used with different meanings in different statutes, is true but unavailing;" yet on the other hand it cites unrelated statutes, 28 U.S.C. Secs. 1495-1497, 1499, and 1346(a)(2), for support of its interpretation of the word "claim."
 
 
 [6]
 Under 28 U.S.C. Sec. 2415 and 31 U.S.C. Secs. 231-235 the very same demands for money that the majority says require a petition under Sec. 1491 are claims from the date of their inception in an invoice or other document
 
 
 [7]
 The Department of Justice letter (from Acting Assistant Attorney General Michael W. Dolan) in pertinent part stated:
 As noted, the bill would vastly broaden the equitable power of the Article I Claims Court judges by authorizing them to enter declaratory judgments and grant injunctive relief. In our view, this vast expansion of power would drastically alter the nature of the Government's waiver of sovereign immunity and could lead to serious and untoward disruptions in the award and administration of Government contracts.
 * * *
 We therefore strongly recommend the adoption of the following amendment, which would maintain--but not expand--the existing powers of the Court of Claims:
 On page 24, line 22, strike "to read as follows:" and everything following thereafter through page 26, line 12, and insert in lieu thereof:
 by striking out "Court of Claims" the first place it appears and inserting in lieu thereof "United States Claims Court" and by striking out "Court of Claims" each other place it appears and inserting in lieu thereof "Claims Court".
 
 
 [8]
 As indicated in the Justice Department letter, the Government's concern was not just with the administration of government contracts but also with judicial interference in the award of government contracts. There is no question that under the majority's view, Sec. 1491(a)(3) permits judicial interference in the award of contracts
 
 
 [9]
 Section 609(a) in pertinent part states:
 (1) Except as provided in paragraph (2), and in lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Claims Court, notwithstanding any contract provision, regulation, or rule of law to the contrary.
 (2) In the case of an action against the Tennessee Valley Authority, the contractor may only bring an action directly on the claim in a United States district court pursuant to section 1337 of title 28 notwithstanding any contract provision, regulation, or rule of law to the contrary.
 (3) Any action under paragraph (1) or (2) shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim, and shall proceed de novo in accordance with the rules of the appropriate court. [Emphasis added].
 
 
 [10]
 Such money claims involving government contracts include suits concerning violations of implied contracts. See 41 U.S.C. Sec. 602; Keco Industries, Inc. v. United States, 428 F.2d 1233, 192 Ct.Cl. 773 (Ct.Cl.1970); Heyer Products Co. v. United States, 140 F.Supp. 409, 135 Ct.Cl. 63 (Ct.Cl.1956)
 
 
 [11]
 H.R.Rep. No. 97-312, 97th Cong., 1st Sess. 43 (1981) in pertinent part states:
 The new section 1491(a) does give the new Claims Court the augmented power to grant declaratory judgments and give equitable relief in contract actions prior to award. This enlarged authority is exclusive of the Board of Contract Appeals and not to the exclusion of the district courts. It is not the intent of the Committee to change existing caselaw as to the ability of parties to proceed in the district court pursuant to the provisions of the Administrative Procedure Act in instances of illegal agency action. See, e.g., Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir.1970).
 Similarly, S.Rep. No. 97-275, 97th Cong., 1st Sess. 23, reprinted in 1982 U.S.Code Cong. & Ad.News 33 in pertinent part states:
 By conferring jurisdiction upon the Claims Court to award injunctive relief in the pre-award stage of the procurement process, the Committee does not intend to alter the current state of the substantive law in this area. Specifically, the Scanwell doctrine as enunciated by the D.C. Circuit Court of Appeals in 1970 is left in tact [sic]. See Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir.1970) Moreover, the Committee expects that the court will utilize the authority conferred upon it by this section only in circumstances where the contract, if awarded, would be the result of arbitrary or capricious action by the contracting officials, to deny qualified firms the opportunity to compete fairly for the procurement award. The Committee intends the court to take care not to delay or prevent the award of contracts for goods or services which relate to the national defense or security.
 Since the court is granted jurisdiction in this area, boards of contract appeals would not possess comparable authority pursuant to the last sentence of section 8(d) of the Contract Disputes Act. [Emphasis added].
 
 
 [12]
 Other cases involving the Scanwell situation include William F. Wilke, Inc. v. Department of the Army, 485 F.2d 180 (D.C.Cir.1973); Ainslie Corp. v. Middendorf, 381 F.Supp. 305 (D.Mass.1974); Cincinnati Electronics Corp. v. Kleppe, 509 F.2d 1080 (6th Cir.1975); Collins & Co. v. Claytor, 476 F.Supp. 407 (N.D.Ga.1979); Robert E. Derecktor of Rhode Island, Inc. v. Goldschmidt, 506 F.Supp. 1059 (D.R.I.1980)
 
 
 [1]
 The majority's interesting discourse on Congress' "misleading" use of the word "jurisdiction" in section 1491(a)(3) (see note 6 of the majority's opinion) is undoubtedly a logical extension of the theory that "claim" means "action," which means "lawsuit." If the majority finds the word "jurisdiction" misleading, then it should affirm the Claims Court's dismissal of this case on the basis of lack of "power," not "jurisdiction."
 
 
 [2]
 For example, 28 U.S.C. Sec. 2501, amended by the Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, Sec. 139(a), 96 Stat. 25, 42, imposes a 6-year period of limitations on "[e]very claim of which the United States Claims Court has jurisdiction"; 41 U.S.C. Sec. 609, amended by the Federal Courts Improvement Act of 1982, Sec. 161(10), 96 Stat. 49, which authorizes a "direct access" suit in the Claims Court under the Contract Disputes Act, permits a contractor to file within 12 months of the date of receipt of the decision of the contracting officer
 
 
 [3]
 H.R.Rep. No. 312, 97th Cong., 1st Sess. 43 (1981) states:
 "Since the funds which the Government utilizes to purchase goods and services are derived solely from public sources, the public has strong interest in the ability of the Government to fulfill its requirements in these areas at the lowest possible cost. Accordingly, in the very vast majority of circumstances, the Government must be permitted to exercise its right to conduct business with those suppliers it selects and to do so in an expeditious manner. Yet, at the same time the Government must respect the rule of law. If it deviates from that norm it must be accountable for its actions in the courts, which are equipped with certain powers to redress proven wrongs. Hopefully, by modestly increasing the powers of the Claims Court, the needs of a cost-effective government contract system and of a lawful government contract system will both be met."
 See also S.Rep. No. 275, 97th Cong., 1st Sess. 32, 33 (1981).
 
 
 [4]
 In Schlosser's case, the contractor was told on September 30, 1982, by the contracting officer, in writing, that it would be informed of his decision on the protest "before an award is made."
 
 
 [5]
 Lest the majority, or anyone else, be misled, it is not argued here that section 1491(a)(3), or any other statute applicable to this case, requires an "exhaustion of administrative remedies" in a bid protest suit filed in the Claims Court. It is merely pointed out that Congress has a general preference for the nonjudicial resolution of contract and bid protest disputes where feasible
 
 
 [6]
 See, e.g., 28 U.S.C. Sec. 2501, as amended, which states: "Every claim of which the United States Claims Court has jurisdiction shall be barred unless the petition is filed within six years after such claim first accrues." It is of course absurd to suggest that "claim" in this context means "lawsuit."
 
 
 [7]
 "Legislative history" other than official committee reports is highly suspect if attempted to be used to establish congressional intent. Selman v. United States, 498 F.2d 1354 (Ct.Cl.1974). Congressional committee reports are even improperly used to override the plain language of a statute. Hart v. United States, 585 F.2d 1025, 218 Ct.Cl. 212 (Ct.Cl.1978)